UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No.: 1:07 CR 134 |
| | ) | |
| Plaintiff | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| v. | ) | |
| | ) | |
| DEMETRIUS MOORE, | ) | |
| | ) | |
| Defendant | ) | <u>ORDER</u> |

This case arises from a two-count Indictment, alleging: (1) that Demetrius Moore ("Defendant") did knowingly and intentionally possess with intent to distribute fifty (50) grams or more of a mixture or substance containing a detectable amount of cocaine base (crack), a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A); and (2) that Defendant, having been previously convicted of a crime punishable by imprisonment for a term exceeding one year, did knowingly possess a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1). (Indictment, ECF No. 8.) Currently pending before the court is Defendant's Motion to Suppress physical evidence seized during Defendant's arrest as well as all statements made by Defendant subsequent to his arrest. (ECF No. 17.) On June 7, 2007, the court held a hearing on the Motion to Suppress. Officer Guy Sako ("Officer Sako") and Detective James Cudo ("Detective Cudo") testified for the government. Albert Martin ("Martin") and Russell Hambline ("Hambline") testified for the defense. For the reasons set forth below, Defendant's Motion to Suppress (ECF No. 17) is denied in part and granted in part.

## I. FACTUAL BACKGROUND

### A. Prosecution's Account

On February 7, 2007, at approximately 12:14 a.m., Officer Sako and his partner, Officer Mauer, conducted a traffic stop involving Defendant at East 49th Street and St. Clair Avenue. Defendant was driving a black Jeep Cherokee ("Jeep") with the high beams on in violation of a City of Cleveland ordinance.[1] When the officers activated their lights to initiate the traffic stop, Defendant was already in the process of pulling over and parking by the curb. The officers stopped their vehicle beside the Jeep, placing the Jeep in between the officers' vehicle and the sidewalk. As the officers exited their vehicle and approached the Jeep, Defendant was already exiting. Officer Sako asked Defendant for his driver's license and Defendant replied that he didn't have one. At this point, Officer Sako told Defendant that he was under arrest for operating a vehicle without a driver's licence and that he was going to be pat down.

As Officer Sako began to pat Defendant down, Defendant lunged to get back into the Jeep and a struggle ensued. During the struggle, Defendant repeatedly reached for the waistband area of his pants. The officers wrestled Defendant to the ground and, after about four minutes, subdued and handcuffed him. The officers searched the area where Defendant had been reaching during the struggle and found two large bags of crack cocaine in Defendant's waistband area between his long johns and underwear. Defendant, while still handcuffed, attempted to reach into his coat. The

---

[1] Officer Sako testified that, due to a typing error made by his partner, when they originally ran Defendant's license plates, they did not match the Jeep. The error was discovered and Defendant's plates were valid. Defendant was never cited for fictitious plates.

officers searched the coat and found one more bag of crack cocaine. Defendant was then placed under arrest.

The officer, pursuant to Cleveland Police Department procedure, ordered that the Jeep be towed and that an inventory search be performed. During the inventory search, the officers recovered $940.00 in cash, two digital scales, three cell phones, a clear plastic container of suspected marijuana, an open bottle of Grey Goose vodka, and a loaded .40 caliber handgun. The handgun was found, partially exposed, under the front seat. Officer Sako issued Defendant a ticket for high beams and driving without a driver's license. (*See* Government's Ex. 1.) Officer Mauer issued Defendant a citation for possession of marijuana and for the open container in the Jeep. (*See* Government's Exs. 1, 2.) Defendant was taken to the Second District police station where he was booked and held.

Around 8:05 p.m., Detective Cudo conducted and recorded a post-arrest interview of Defendant at the Second District police station.[2] Detective Cudo advised Defendant of his *Miranda* rights and Defendant verbally acknowledged that he understood them.[3] Defendant did not ask for an attorney, nor did he indicate that he would not answer questions or seek to terminate the interview. However, a review of the audio recording made of the interview indicates that immediately after advising Defendant of his rights and receiving a faint, barely audible, verbal acknowledgment from

---

[2] The post-arrest interview of Defendant, conducted by Detective Cudo, was recorded and admitted into evidence during the hearing on the Motion to Suppress. (Government's Ex. 3.)

[3] While the government avers in its Response that Defendant was given his *Miranda* rights at the time of arrest, there is no evidence in the record that supports this contention. (Government's Resp. to Def.'s Mot. to Suppress at 2.) Consequently, the court must assume that the only *Miranda* warning given was at the beginning of the post-arrest interview conducted by Detective Cudo.

Defendant that he understood his rights, Detective Cudo, without pause, began to interrogate Defendant. The post-arrest interview began as follows:

| | |
|---|---|
| DET. CUDO: | I'm just here, I hear there was a situation last night. First of all, you remember your rights. You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to an attorney during any questioning. If you can't afford one, one will be provided for you. Do you understand your rights? |
| [DEFENDANT]: | Yes. |
| DET. CUDO: | I'm here because you are in a bad situation. Obviously, we're going to take you over to the Feds, let them eat you up. You ain't going to get a bond, you're done. Or do you want to take your chances and cooperate? |
| [DEFENDANT]: | (Inaudible). |
| DET. CUDO: | You want to start telling me some things, where you got the dope? |
| [DEFENDANT]: | I don't know sir. |
| DET. CUDO: | You don't know nothing? There was dope in your pants. Come on, how is that going to look to a jury? |
| [DEFENDANT]: | I can understand. (Inaudible) fuck around. |
| DET. CUDO: | Who gave you the dope? |
| [DEFENDANT]: | I don't know sir.[4] |

Defendant continued with the interview and responded to all of Detective Cudo's questions. During the interview, Defendant admitted to having been in possession of the crack cocaine and handgun and admitted that he stole them from a male on the east side of Cleveland.

---

[4] The text is taken from the Non Edited Rough Draft Transcript of the Hearing on the Motion to Suppress. The court finds that this quoted portion of the transcript is a fair and accurate representation of the Hearing and of the recording of the interview.

## B. Defendant's Account

Defendant's account of the facts differs from that offered by the prosecution in a few ways. First, the two witnesses for the defense stated that the officers, as they approached the Defendant after the initial stop, told Defendant to get back into his Jeep and then to get back out. (Tr. of Mot. to Suppress Hr'g at 46, 102.) Martin, the first defense witness, stated that he could hear the officers' orders, while Hambline, the second defense witness, stated that he was inside the bar and could only see what was happening. Hambline stated that he "could tell by [the officers'] gestures" that the officers told Defendant to get back into, and then out of, his Jeep. (*Id.* at 112.)

Second, the testimony of both witnesses for the defense conflicted with the testimony of the officers regarding whether the officers searched the Jeep before or after Defendant was handcuffed. Martin first testified that the officers handcuffed Defendant before the Jeep was searched and then later testified that Defendant was not handcuffed until after the officers found the gun in the Jeep. (*Id.* at 80, 86.) Likewise, Hambline, at first, testified that the officers handcuffed Defendant promptly after the initial stop and prior to any search of the Jeep and then later in his testimony stated that Officer Mauer searched the Jeep before Defendant was handcuffed. (*Id.* at 103-04, 120.)

Lastly, Defendant avers in his Motion to Suppress that the officers used excessive force while placing him under arrest. (Def.'s Mot. to Suppress at 2.) Both defense witnesses commented several times during their testimony on what they considered to be the officers' use of excessive force during the arrest. For example, Martin stated that "one policeman hit him with an elbow to the face" and that after Defendant fell, they picked him up and "hit him in the stomach." (Tr. of Mot. to Suppress Hr'g at 46.) Then the officers "smashed" him into the police car. (*Id.*) Similarly, Hambline testified that the officers hit Defendant in the head and stomach before they "threw him in the car." (*Id.* at

104.) Hambline further testified that although Defendant obeyed the commands of the officers, "[the officers] just got physical." (*Id.* at 108.)

In Defendant's Motion to Suppress he avers that he "committed no offense" and that he was stopped, arrested, and searched in violation of his Fourth Amendment rights. (Def.'s Mot. to Suppress at 3.) He avers that his Fourth Amendment rights were further violated when his Jeep was unlawfully searched. Consequently, Defendant seeks to suppress all evidence seized from his person and Jeep, as well as any subsequent oral statements, as they were "the fruit[s] of an unlawful arrest." (*Id.* at 2.)

## II. LAW AND ANALYSIS

As a threshold matter, the court notes that it has to make some credibility determinations in deciding whether the motion to suppress is well-taken. On balance, the court finds the government's version of the facts more credible, although not necessarily in regard to the amount of force the police officers used when placing Defendant under arrest.

### A. Initial Stop

Defendant avers that he committed no offense and that his seizure was a violation of his Fourth Amendment rights. Stopping a vehicle and detaining its occupants constitutes a seizure under the Fourth Amendment, even where the purpose of the stop is limited and the detention is brief. *Delaware v. Prouse*, 440 U.S. 648, 653 (1979); *United States v. Freeman*, 209 F.3d 464, 466 (6th Cir. 2000). Consequently, an automobile stop is "subject to the constitutional imperative that it not be unreasonable under the circumstances." *Whren v. U.S.*, 517 U.S. 806, 810 (1996) (quotations omitted). However, it is well settled that stopping a vehicle and detaining its occupants is reasonable

"where the police have probable cause to believe a traffic violation has occurred." *Id.*; *see U.S. v. Akram*, 165 F.3d 452, 455 (6th Cir. 1999); *U.S. v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993).

In the instant case, the court finds that the officers stopped the vehicle because they observed Defendant operating the vehicle with high beams on in violation of a city ordinance. Thus, having "probable cause to believe a traffic violation had occurred," the traffic stop was lawful and not a violation of Defendant's Fourth Amendment rights. *Whren*, 517 U.S. at 810.

### B. Defendant's Arrest

Defendant further avers that he is the victim of an unlawful arrest. A warrantless arrest is lawful where the arresting officer has probable cause to believe that a crime has been or is being committed. *See, e.g., Gerstein v. Pugh*, 420 U.S. 103, 112-14 (1975). Probable cause exists where the "facts and circumstances [are] 'sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense.'" *Id.* at 111 (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)) (second alteration in original). Further, a police officer's "on-the-scene assessment of probable cause provides legal justification for arresting a person . . . ." *Id.* at 113-14. Additionally, an officer has the authority to arrest an individual where he has probable cause to believe that the individual has committed even a very minor criminal offense in his presence. *See Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001).

Defendant's high beam offense gave the officers probable cause to arrest him. Subsequent to the initial stop, Officer Sako approached Defendant and asked for his driver's license. Defendant replied that he didn't have one. Driving without a license is a violation of Section 435.01(a) of the City of Cleveland Codified Ordinances, a first degree misdemeanor, and hence an arrestable offense. *See State v. Griffin*, No. 86326, 2006 WL 1044497, ¶ 17 (Ohio Ct. App. Apr. 20, 2006) (slip copy).

The officers' observance of Defendant operating his vehicle, coupled with the Defendant's own statement that he did not have a driver's license, was "sufficient to warrant [the officers] in believing that [Defendant] had committed . . . an offense" in the officers' presence, giving rise to the probable cause to lawfully arrest Defendant without a warrant. *See Beck*, 379 U.S. at 91; *Atwater*, 532 U.S. at 354.

At this point, Officer Sako advised Defendant that he was under arrest for driving without a driver's license and ordered him to place his hands on the vehicle for a pat down. As Officer Sako began to pat Defendant down, Defendant attempted to get into his car and forcibly resisted arrest. During the struggle that ensued, Defendant repeatedly reached for his waistband area. After the officers subdued and handcuffed Defendant, they made a protective search of Defendant's person and found two bags of crack cocaine in Defendant's waistband area and another bag in Defendant's coat. These two additional violations, resisting arrest and possession of crack cocaine, gave the officers cause to arrest Defendant. The court finds that the officers had probable cause to arrest and, therefore, Defendant was lawfully arrested.

### C. Search of Defendant

Defendant avers that the search of his person was a violation of his Fourth Amendment rights. It is well settled that incident to a proper warrantless arrest, "a full search of the person may be made without a warrant." *U.S. v. Kaye*, 492 F.2d 744, 746 (6th Cir. 1974); *see U.S. v. Campbell*, No. 06-3321, 2007 WL 1501281, at *5 (6th Cir. May 24, 2007); *U.S. v. Fullerton*, 187 F.3d 587, 591 (6th Cir. 1999). Additionally, regardless of a lawful arrest, searches are permitted for the protection of an officer where a "reasonably prudent man in the circumstances would be warranted in the belief

that his safety or that of others was in danger." *Terry v. Ohio*, 392 U.S. 1, 27 (1968); *see U.S. v. Williams*, 962 F.2d 1218, 1223 (6th Cir. 1992).

In the instant case, the officers searched Defendant's person once they were able to subdue and handcuff him. Because this search was done incident to a lawful arrest, the search itself was lawful. *Kaye*, 492 F.2d at 746. Additionally, even if the search had been not been performed incident to a lawful arrest, the officers would have still been lawfully justified in performing a protective search of the Defendant's person for the purpose of officer safety. During the struggle with Defendant, the officers observed Defendant repeatedly reach for his waistband area. Further, after Defendant was subdued and handcuffed, he attempted to reach into his coat pocket. The court finds that, under the circumstances, the officers were "warranted in the belief that [their] safety or that of others was in danger" and thus, the search was reasonable. *Terry*, 392 U.S. at 27.

Accordingly, the court finds that the search of Defendant's person was lawful both because it was done incident to a lawful arrest and also as a protective search. As the court finds the search was lawful, the evidence discovered during the search, three bags of crack cocaine, was properly seized.

### D. Search of Defendant's Car

As the court has found that the initial stop, arrest, and search of Defendant's person were lawful, the court rejects Defendant's "fruit of an unlawful arrest" theory for suppressing the handgun and other physical evidence recovered from Defendant's Jeep. The court now examines the totality of the circumstances to determine whether the evidence recovered from Defendant's car was reasonably seized.

Police officers are permitted to "conduct a search of a vehicle associated with a defendant's lawful arrest for the purpose of taking an inventory of its contents prior to impoundment, even if the police have no probable cause to otherwise search the vehicle." *Campbell*, 2007 WL 1501281, at *8; *see Colorado v. Bertine*, 479 U.S. 367, 374 (1987). An inventory search is not conducted to discover evidence, but rather for: (1) "the protection of the owner's property while it remains in police custody[;]" (2) "the protection the police against claims or disputes over lost or stolen property[;]" and (3) "the protection of the police from potential danger." *South Dakota v. Opperman*, 428 U.S. 364, 369 (1976) (citations omitted).

The court finds the inventory search lawful as it was conducted, pursuant to Cleveland Police Department procedures, "for the purpose of taking an inventory of its contents prior to impoundment" and was "associated with [Defendant's] lawful arrest." *Campbell*, 2007 WL 1501281, at *8. As the court finds the search was lawful, the evidence discovered during the search, $940.00, two digital scales, three cell phones, suspected marijuana, an open bottle of Grey Goose vodka, and a loaded .40 caliber handgun, was properly obtained and will not be suppressed.

### E. Defendant's Oral Statements

Defendant asks the court to suppress the oral statements made by Defendant while he was in custody as they were "the fruit[s] of an unlawful arrest" and in violation of his *Miranda* rights. As the court has found the initial stop, arrest, and searches lawful, thereby precluding Defendant's "fruit" theory, the court now examines the admissibility of Defendant's statements under the *Miranda* standard.

As established by *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court has held that the Fifth Amendment privilege against self-incrimination "protects individuals from 'informal

compulsion exerted by law-enforcement officers during in-custody questioning.'" *Machacek v. Hofbauer*, 213 F.3d 947, 954 (6th Cir. 2000) (quoting *Miranda*, 384 U.S. at 461). Under the *Miranda* standard, a suspect must be informed that he has the right to remain silent and that anything he says can be used against him in a court of law. *See Miranda*, 384 U.S. at 444. Further, the suspect must be informed that he has the right to the presence of an attorney and that if he cannot afford an attorney, one will be appointed for him prior to any questioning if he so desires. *Id.*

For a suspect's statements to be admissible as evidence, the suspect must "knowingly, voluntarily, and intelligently waive[] these [*Miranda*] rights." *Machacek*, 213 F.3d at 954. In determining whether a suspect has validly waived his *Miranda* rights, a court will examine "the totality of the circumstances surrounding the investigation" and see if it "reveal[s] both an uncoerced choice and the requisite level of comprehension." *Id.* (quotation marks omitted).

There is no requirement that a defendant's waiver of *Miranda* rights must be in writing. *North Carolina v. Butler*, 441 U.S. 369, 374-76 (1979); *U.S. v. Stevens*, 445 F.2d 304, 305 (6th Cir. 1971) (italics added). Further, a defendant's waiver need not be express; in some cases, "waiver can be clearly inferred from the actions and words of the person interrogated." *Butler*, 441 U.S. at 373; *see U.S. v. Kaufman*, 92 F. App'x 253, 256 (6th Cir. 2004) (holding that where a defendant was advised of, and understood, his *Miranda* rights and he never requested counsel, declined to speak, or sought to terminate the interview, but instead continued to make inculpatory statements after being reminded of his *Miranda* rights, the defendant "voluntarily and intelligently waived his Miranda rights"); *U.S. v. Miggins*, 302 F.3d 384, 397 (6th Cir. 2002) (holding that a valid waiver may be inferred when, after being advised of his *Miranda* rights, a defendant agrees to answer questions without an attorney present). Although it is well settled that waiver cannot be inferred from silence

alone, a defendant's waiver "may in some cases be inferred . . . from the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver." *Seymour*, 224 F.3d at 554 (quoting *Butler*, 441 U.S. at 372-73).

The Supreme Court has stated that while a voluntary waiver of *Miranda* rights may be inferred in some situations, in the absence of an express waiver, "courts must presume that a defendant did not waive his rights." *Butler*, 441 U.S. at 373. The state bears the burden of proving that a defendant has waived his rights and this "burden is great." *Id.*

The facts in the instant case are distinguishable from cases in which courts found an implied waiver. For example, in *Miggins*, the court found that the defendant had "agreed to answer [the officer's] questions without first speaking to [an] attorney," after having been informed of his *Miranda* rights. *Miggins*, 302 F.3d at 397. In the instant case, on the other hand, Defendant made no such agreement. Similarly, in *Kaufman*, the court found an implied waiver where the defendant was advised of his *Miranda* rights both orally and in writing and then later reminded of his rights before continuing to make inculpatory statements. *Kaufman*, 92 F. App'x at 256. In the instant case, however, Defendant was advised of his rights once, orally, and then immediately interrogated, without so much as a moment to reflect on the consequences of either waiving or exercising his rights.

In the instant case, it is undisputed that Detective Cudo did not expressly seek Defendant's waiver either orally or in writing. Likewise, it is undisputed that Defendant did not expressly waive his rights. Instead, after Detective Cudo informed Defendant of his rights and asked Defendant if he understood them, Detective Cudo began a swift avalanche of questions such as, "Who gave you the dope?" and intimidating statements such as, "[W]e're going to take you over to the Feds, let them

-12-

eat you up." Although Detective Cudo asked Defendant whether Defendant wanted to "take [his] chances and cooperate" and whether Defendant wanted to "start telling [Detective Cudo] more things," the questions followed, without pause, after Defendant acknowledged he understood his rights and allowed no opportunity for reflection. Defendant's first several responses during the questioning were short and Defendant repeatedly said, "I don't know, sir." As such, it appears that Defendant's responses to Detective Cudo's questions were less volitional and more of an attempt to parry the pokes and proddings of the interrogation.

The court finds that the facts and circumstances in the instant case do not support a clear inference that Defendant implicitly waived his *Miranda* rights. To hold that an effective waiver can be inferred where the only evidence offered by the government is that the defendant continued to respond to questions after acknowledging his understanding of his *Miranda* rights, with nothing more, would effectively turn the burden upside down and obliterate the long-standing rule requiring that a defendant waive his rights prior to questioning. Consequently, the government has not met its burden to rebut the presumption that, absent an express waiver, the court must presume that Defendant did not waive his rights. Thus, Defendant's statements made during his post-arrest interview with Detective Cudo violated Defendant's Fifth Amendment rights and are not admissible as evidence.

### III. CONCLUSION

For the reasons set forth above, Defendant's Motion to Suppress (ECF No. 17) is granted in part and denied in part.  Specifically, the motion is granted as to the statements made during the post-arrest interview conducted by Detective Cudo and denied as to all other evidence.

IT IS SO ORDERED.

/s/ *SOLOMON OLIVER, JR.*
UNITED STATES DISTRICT JUDGE

July 19, 2007